We'll hear argument next in Case 10-9647, Jackson v. Hobbs.  Hobbs, Jr. Thank you, Mr. Chief Justice, and may it please the Court, I haven't changed your mind in the interview. No, Justice Scalia, I haven't. I do want to emphasize, yes. Could you start? I know that Edmund and Tyson has to do with death eligibility. With respect to adults. But it does draw a line between death eligibility with respect to intentionality or not, or recklessness, assuming, for the sake of argument, that some of us might be interested in whether a line should be created for juveniles who intended or didn't intend death with respect to their eligibility for life without parole, whether it's mandatory or voluntary. How would we write that? Would we just import all the Edmund and Tyson jurisprudence, or would we say something different with respect to juveniles? Well, I think you could do that. In fact, in Graham, the Court makes these statements that they are trying to exempt and shield juveniles who did not kill, quote, or did not intend to kill. And that language could be a basis for organizing the Court's thinking on this issue. And obviously, in this case, where there wasn't a requirement of the specific intent to kill that was required in the Alabama case, that might dictate a certain different outcome. I think the challenge with that is that juvenile status, juvenile intent, is a much more complicated issue. And that, for many of the same reasons that are problematic with how kids function at the first stage of these trials, it would be hard to do. Sotomayor That has to do with your general rule, which we shouldn't impose it at all. That's right. But if we go even to your second-step rule, assuming we bifurcate, then we still have the question of when do we permit a mandatory imposition of bifurcation. I think there's no question, Justice Sotomayor, there would be more justification for those crimes where there is an intent to kill, because this Court, in its jurisprudence, has recognized that kind of hierarchy, which you've outlined and exhibited in Edmund and in the Court's other cases. Now, it's true that in Arkansas, under this provision, an adult would still be subject to the death penalty because they used this recklessness language, so that even the other juveniles, which I think the Court can rightly acknowledge, have diminished culpability. It's also worth noting that in many of these States where there are children being sentenced to life without parole, there is no confusion about this. They are being convicted of homicide offenses for which there is no intent to kill, no dispute. Those jurisdictions, those provisions would likely be addressed by the Edmund analysis. Sotomayor, in fact, Jackson was convicted with a non-intent, just felony. Well, you're absolutely right that it's felony murder, but it's a little different. In Arkansas, if you cooperate or give aid to someone who commits a crime, even if it's not intentional, if it's a reckless indifference to life, you can be found guilty of what is capital felony murder. And the Arkansas court has interpreted that to mean for an adult, you'd be subject to the death penalty. And here, Contralt-Jackson was subject to life without parole. The State argues that there was support for that and even some kind of intent, because there was a dispute about the words, just quickly, you know, these three kids. Sotomayor, all the jury found was that he didn't meet his affirmative burden of proving. That's correct. That's exactly right. And they didn't counsel, they didn't make a finding of what words were used and what the intent was. That's exactly right. And the dissenters at the Arkansas Supreme Court relied on that in making the determination that they did not conclude that intent had been established here in a way that would support the judgment that we seek. But that goes back to one of the earlier questions that was posed about what happens at the guilt phase. Justice Kennedy, it is true that in Alabama and in most jurisdictions, you would not be permitted to tell the jury what the sentencing outcome would be. And in many of these cases, there isn't a lesser included. So that's going to be up to the prosecution in some of these crimes. And there are a range of offenses for which that would not help a jury kind of deal with the kind of choice that they're making. Alito, is that true under the law of Arkansas? In most jurisdictions, I would think, if someone's charged with the highest degree of homicide, the defense can request an instruction on, you don't have to have a separate charge on a lesser included offense, the defense can request an instruction on lesser included offenses if it would be supported by the evidence. It would really depend, Justice Alito, on the facts. For example, one of our provisions in Alabama makes the crime sort of a homicide, a capital crime, if the victim is under the age of 14. You're not entitled to some diminished culpability, some other kind of homicide charge, unless there's something else going on that would support that. Our laws and this Court's laws say there has to be evidence in support of that lesser culpability, and we're constitutionally obligated to provide it, and so for that reason, it's not a given that that would happen. And I think the challenge with the mandatory scheme that we've been talking about in both of these cases is that it does put the sentence in a very difficult situation where there is no ability to consider the age, there is no ability to consider the factual diminished culpability that might exist in one case or the other, no ability in either of these cases to consider the fact that an older co-defendant got a lesser sentence, that there is something else going on here that goes beyond just the particulars of this crime and this particular offender. Breyer, before we leave it, could you, what was the instruction the jury was given? Was it, you find him guilty if he was deliberately indifferent, if he was recklessly What are the words they used? It's a reckless indifference to life. If he was recklessly indifferent to life. And if he gave aid or assistance to someone in that capacity, and the question Justice Breyer turned on this statement made, that the defendant, the co-defendant who testified against Cuntrell Jackson initially told the police that he came in and said, we ain't playing, and then he testified that he said, I thought y'all were playing. I'm not sure reckless indifference means that. Meaning, if he knew they were carrying guns, doesn't that make him liable for the reckless indifference, whether he thought they would use them or not? Yes. And that's what the State argued here, is that the fact that he had knowledge of this gun and that they went in there made him guilty of reckless indifference, even though it didn't create the kind of intent to kill that we typically require for these kinds of showings. That's, again, why there was the significance around this language. If you come in and you say something declaratory that suggests that it's directed at the victim, it might help kind of support that intent finding if you don't. Breyer, reckless indifference to life suffices for the death penalty for an adult. Yes. What the Court does actually is that if that's right, then we'd you would have to argue on if we took this tack, which I don't know that we would, but that you cannot sentence a juvenile to life without parole for murder unless he, e.g., specifically intends the death, or something equivalent, but something stronger than reckless indifference to life. That's correct, Justice Breyer. And again, the Court knows its own precedents, but as you'll recall, Tyson followed Edmund, and in Tyson v. Arizona, it's when the Court allowed there to be this kind of room around this intent standard in the way that you just described. So you would draw the line at specific intent to kill? Again, my my, I would I would categorically prohibit no matter what the intent is. I think particularly for children of this age, which I think this case highlights, what's meant by I thought you all were playing versus we ain't playing isn't a very good indicator of whether someone should be subject to life without parole. What if it was a lot clearer? What if they had said, okay, before we go in, let's understand what's going on here. Shields has got has got a sawed-off shotgun, and if we need to use it, we'll use it, we'll do whatever it takes to to bring this off. I think the evidence. Maybe there might not be a specific intent to kill there. Yeah. I think the evidence that would support a finding of aggravated murder would obviously be stronger. But even there, and this is what the Court points out in in Roper, that the decision making of children, that the thinking of children, is categorically different. They're not thinking three steps ahead. They're not thinking about consequences. They're not actually experienced enough with the world to understand how they deal with their frustrations in the same way that an adult is. And so their judgments about what they intend to do, their declarations, mean something very, very different. And one of the factors that we haven't talked about there, I just want to emphasize, is it's not just their inherent internal attributes, it's also the external circumstances that they find themselves in. Conrail Jackson was born in a household where there was nothing but violence and guns and people shooting each other. His grandmother shot his uncle, his mother shot a neighbor, his brother shot someone. They were all put to jail. But unlike an adult, these children don't have the ability to escape. A child of 14 cannot leave his criminogenic or violent environment. They have no control over that. And because of that, I think it does reinforce why even their judgments, their so-called intentional judgments, reflect a very different kind of understanding of their character, their potential for rehabilitation, than it would with an adult. Kagan. One of the arguments that the State makes is that when you look at all these numbers, the number that is most different between this pair of cases and Graham is the denominator. And I'm wondering whether you would address that, what kind of denominator we should be using here, and how it compares to the denominators that we've used in past cases. Yes. I think, first of all, it is true that homicide offenses are less common than non-homicide offenses. In Graham, this Court looked at a range of non-homicide crimes, and that was a huge number, 300,000. That's largely because we were talking about a multitude of offenses, and here we're talking about a single offense. I think the fact that there have been 7,000 children arrested for homicide and non-negligent murder, a manslaughter, over this 40-year time period, and only 79 children have been sentenced to life without parole, is a significant fact that reinforces our claim that this is a very rare sentence. That is 1 percent. And the fact that it's over 40 years, that's also true for the 79. We got to that. But it's arrests to start out with. It's not convictions. That's right. And it's not for the type of offense for which one could be sentenced to life in prison and without parole. It's a broader category of homicide offenses. Well, you're absolutely right, Justice Alito, on the first point, that these are arrest data. Of course, that's what we used in Graham, because, again, in this cohort, conviction data simply is very difficult to get. But it's not true that only children arrested for aggravated murder are subject to life without parole. As I've mentioned, in the States that create the largest population of these kids, all kinds of homicide can subject you to life without parole. So it is true. Is it true that in the States that permit life without parole for a minor homicide, a minor murder, a person, a minor convicted of murder, that that is permitted for every non-negligent homicide? In some States, yes. That is, to the extent that you are you get convicted of murder, some of these States, South Dakota and Pennsylvania, come to mind, whether it's first degree or second degree, there is no life imprisonment without parole, and it is a mandatory sentence. Alito, in some States, but not in all the States. Not in all States. So it's a really, you've got a very imprecise denominator. You have arrests for a broader category of offenses. Yes. But I don't think we know how much smaller that number would be if we narrowed it down appropriately, do we? Well, we can't get beyond what the data tell us, but I want to suggest it's no less precise than what this Court had to deal with in Graham. In Graham, we talked about 380,000 non-homicide offenders. Half of that class were people convicted of drug crimes, which no one has suggested would subject you to life without parole. Another 60,000 were convicted of assaults, and kids get into fights all the time. But we used the aggregate of all of those numbers when we made that comparison. So I'd actually argue that we're dealing here with a category definition that is much more precise than what we dealt with in Graham. And, Justice Kagan, to return to your question, we do have some precedents that help us with this. In Coker v. Georgia, this Court was trying to make an assessment about the propriety of the death penalty for the crime of rape. And what this Court noted was that 9 out of 10 of the juries that made decisions about life v. death chose life. And there we were talking about kind of a death rate, if you will, of 10 percent. Here, with a larger universe, we're talking about a rate of 1 percent. Breyer, how do you think about this, which is not your favorite position, but it's a position you take? It's the same question I asked before. If I say, well, doesn't there have to be some line, 3 years old, he'll say, of course. 10 years old, he'll say, of course, but nobody — there's no problem with sentencing 10-year-olds to life without parole. 12 years old, well, hmm, now, maybe your opponents want to defend that one. 13 years old, 14 years old, and of course, I'm walking right into the buzz saw, well, leave it up to the legislature. But suppose that there's something to be said for not leaving it up to the legislature, at least for the numbers that are in that range. But how would you defend the cutoff at for no life without parole? At, say, 14, older than 14, rather than older than 15, rather than older than 13. What kind of argument is there that isn't totally random for picking that number as the age below which you cannot impose life without parole, even for the most horrendous murder? I think two nonrandom arguments can be made for two ages. I'll start with the young age of 14. When you consider the fact that 13 jurisdictions have thought about this and have all but one set the age above 14, I think we can then rely on that to make a determination that if there's a minimum age, it's above 14. I think we can also, consistent with this Court's precedents, look at the frequency of the sentence for this population. Most States have never sentenced a child to life without parole for a crime at 14. They've just never done it. In 32 States, there are no children 14 and younger serving life without parole. And so I think that allows this Court, in a very nonrandom way, to defend that judgment. But I also think a nonrandom argument can be made to draw the line at 18, that is, offenders under the age of 18. That's exactly what this Court has done at Roper. It's what this Court has done in Graham. What we've relied on about the juvenile status is applicable to that pool. So I concede that these other indicia are not quite as compelling. Breyer. 18 you use for a lot of purposes. 18, you could say, okay, 18. The difficulty with 18 is you're running into 2300, not 79. That's right. And the difficulty is that in Roper it said, well, don't worry so much about not having the death penalty, the other one. Don't worry so much about it, because there's always life without parole. And the fact that 18-year-olds or 17-year-olds in many respects are quite mature or at least can be. And so that makes 18 seem not quite right. Or there's a problem with each of them. So that's what I'm trying to say. But I guess just on that point, Justice Breyer, I think you're right that the indicia are more complicated. But I wanted to stress that they're less meaningful here, because with mandatory sentences they don't tell you the same thing they do in these other contexts. But I also think it's true that we have recognized that up until the age of 18 you are a juvenile. Your status is coherent with what the Court has recognized in these other cases. And so I do think it's defensible there. While it's true that you're more developed than a child of 14 or a child of 10, it's also true that you're not an adult. And we make that distinction in lots of ways. Breyer, any other distinction that you've been able to think of growing out of the where the cutoff for some roughly comparable series of things is between 14 and 15 or between 14 and 16 or something like that? Well, yes. This Court in Thompson made a distinction between offenders that were under the age of 15, 15 and younger, than older offenders. And for 20-some years the law in this country was you could not subject younger offenders to the death penalty in ways that you could older offenders. And so there's clearly precedent for that. And we've appended also lots of statutes, I mean, that also make those kinds of distinctions. I mean, we do draw these lines frequently in a range of areas, not just dealing with the constitutional questions that we're dealing with here. Just kind of to complete my analysis, Justice Kagan, about these comparisons, the other point that I'll reference is that in Thompson this Court was also struggling over this question about frequency and rarity. And what the Court did there is actually look at the number of juveniles that were sentenced to death under the age of 16 that were on death row and compared them to the number of people on death row at the time, and then they noted that it was .36 percent of the population of people on death row. If you did the same thing here, the Sentencing Project reports that there are over 41,000 people in the United States serving sentences of life imprisonment without parole. And if you compare our number of 79 to that, that's actually, again, a lower proportion of people serving life without parole than the Court found to be constitutionally significant in Thompson. So I think Thompson and Coker all reinforce what we're saying here, that this is an exceedingly rare sentence where the majority of States have never chose to impose it, and that would provide a basis for this Court to conclude that it is cruel and unusual. Ginsburg. Ginsburg. Ginsburg. You're making an argument now in Jackson's case, and Jackson was the felony murder case, and I think, at least in your brief, you made the argument it was just happenstance, bad luck that in Jackson's case the shop attendant was killed, and in Graham's case the person who was assaulted survived. But your argument to us seems to make no distinction between the two cases. No, I don't intend to do that, Justice Ginsburg. I think there is a distinction. There's no question that there's a stronger argument that by traditional measures there's lower culpability in Control Jackson's case. He was not found to have specifically intended to kill. In the State of Alabama, he could not have been subject to life without parole, and there are States where he would not be subject to that based on his degree of culpability. I guess my point is, is that even there, there is a challenge if the Court wants to engage in that kind of thinking. What children intend, because they are children, is a very complicated question. It's a very different question. I don't mean to concede that it's an irrelevant question. I think the Court absolutely can and should conclude that there is diminished culpability in the Jackson case, and that's evident based on the facts of the crime. Actually, it was the dissenter in the Jackson case that made this observation about the consequences of crime. And of course, for many non-homicide crimes, there are these kind of fortuities that sometimes prevent death wonderfully, and we're grateful for that. My point is, is that the differences between children and adults, these internal attributes, if you will, these deficits in judgment, are not crime-specific. The person who intends to kill doesn't actually have any better judgment, any more character, any more maturity, any more impulse control than the person who does it. And a way of characterizing a rule would be to recognize that and to create a categorical ban. If there are no further questions, I'll reserve the rest of my time to rebutt. Roberts. Thank you, counsel. Mr. Holt. Thank you, Mr. Chief Justice, and may it please the Court. The decision below falls squarely within the framework of Roper and Graham, and there are three reasons to affirm this judgment. First, murder is the worst of all crimes. Society has drawn that line. Second, legislatures have the power to authorize sentences that are commensurate with crimes like murder. Third, Jackson has not demonstrated any consensus in this case against the practice, and in fact, there is a supermajority of States and of governments that authorize this sentence. The landscape of this case is different than Graham, because in Graham, no one was killed. Terrence Graham was lucky no one was killed, because he acted with a reckless disregard for human life as well. But it's an important thing in our law that the law punishes the result, the harm that is inflicted. And if I could go to the Arkansas statute, Jackson was charged with the highest crime you could be charged with in Arkansas. It was capital felony murder. In that, the legislature has set out several enumerated, several violent felonies that if you commit this particular crime, and aggravated robbery is one of them, if you commit that crime, and in the course and furtherance of that, you or an accomplice act with extreme indifference to the value of human life during the commission of it or in the flight from it, then you are guilty of capital felony murder. So in this case, the jury was called upon because there were other accomplices with Contrell-Jackson. They were called on to determine whether or not Contrell-Jackson acted as an accomplice, whether he aided and assisted, and whether or not he or an accomplice acted with In that process, Contrell-Jackson asserted the affirmative defense that essentially is available for capital murder. He said that I did not have, I was not the trigger man, and I did not commit the homicide offense, and I did not aid or procure counsel. All of those are listed, the exact words of the affirmative defense are listed in our brief at page 4. And he, but he asserted that defense. The Arkansas Supreme Court noted in its opinion that in his challenge to the sufficiency of the evidence, that there was sufficient evidence to convict him of capital murder, and that the jury was well within its right to believe that he said that he, that when he walked in and took the lead in this robbery, that he said, we ain't playing. And after that, the clerk responded that she was going to call the police. Sotomayor, I know that this seems like block building, but I think of law as sort of logical. If you're involved in a felony and you counsel the felony where someone dies under Arkansas law, you're guilty of felony murder, correct? Of capital felony murder, yes, Your Honor. Sotomayor, so whether or not that he intended to counsel the crime, he was guilty of felony murder, unless he could prove the affirmative defense, right? Yes, Your Honor. So obviously, he didn't prove the affirmative defense, but that doesn't mean that the jury actually found that he used one set of words or another. It just means that they didn't believe he had proven by his burden of evidence or by his burden of proof that he had not counseled, correct? That's correct. The Arkansas Supreme Court said they could accept that as they pointed to that as a possibility. As a possibility, yes. But not that it was an actual finding, by the jury. No, no, Your Honor. It was not an actual finding, because an actual, in regard to sentences in terms of years, we don't require that individualized responsibility that we do, for instance, in a death penalty case. So. Breyer, so in Arkansas, if a 13-year-old or 14-year-old is in a getaway car and knowingly accepts the money that someone gets from a robbery and intends to drive off with it, and that other person shoots the teller and kills him, then that individual who is 14 years old is guilty of felony murder, capital felony murder? Your Honor, an inmate. Is that right or not? Yes. Okay. If that's right, do you think that such a person is less culpable knowing only that than a person who actually takes out a gun and shoots the teller, morally speaking? Yes, Your Honor. Okay. Yes. The answer to that question is yes. What is the argument for not being able to tell that to the jury or judge who is going to impose the sentence? What is the argument for not allowing a judge or a jury at least to think about that question before they have to before imposing mandatory life without parole? Well, Your Honor, that telling a jury about that doesn't go to their guilt. Oh, I know. I mean, my obvious point is that the Markinsoff system, once we have he was the getaway driver or assisted getaway driver, they must sentence him at that age, or despite that age, to life without parole. And so the other side is saying, well, at the very least, he has three other positions, but at the very least, the Constitution, maybe it's the Due Process Clause, requires the sentencer to take that into account, the fact that he was just the assistant getaway driver and may not have thought about the murder in reality, and may not have expected it in reality. Why not have to take that into account in sentencing? That's the argument, and I want to hear directly your answer to that, which is taking the fourth or possibly the weakest of his positions or the least radical. What is your answer to that one? Your Honor, a legislative judgment has been made with regard to drawing a baseline for all murderers, whether they're juvenile murderers, whether they're getaway drivers, and when you counsel or aid or do anything that gets you liability for being a capital murderer, then that is the minimum sentence. What he's gotten on account of his youth is he's gotten this Court decided that he could not get the death penalty. All of those individualized characteristics that would give him the lesser penalty, he doesn't even have to put on it. It's swept off the table because he is not exposed, and that is — those are all those factors in terms of what he — what he might — that might mitigate. So he would actually sort of be double-dipping to come back again and say, oh, and by the way, I'm a youth, and so I should get even — I should get not the lesser punishment, I should get the lesser, lesser punishment. So there's a certain symmetry that this case has with — with the Graham case in that the Graham case was very specific about the way it defined itself. One commentator has made the note that the majority opinion in Graham contained the word non-homicide 47 times. Graham essentially said what it wasn't. It wasn't a homicide. It was that other line that society draws between homicide and every other crime. And crimes are — the criminal statutes are scalar. There's a certain amount of culpability that's built into each one of those, whether it be capital murder or first-degree murder or second-degree murder. And it does go on what you know, the knowledge that you have. Maturity is taken into consideration, or immaturity is taken into consideration in capital murder, in that you can't get the worst — if you've been shown to do these acts, you can't get the worst punishment. What is the standard in Arkansas for moving a child from the juvenile system? We heard, I think, in Alabama it was age 13? Your Honor. Age 12. Yes. Your Honor, Arkansas has sort of a three-tier system. The age for moving into the adult system is 14. And — but the middle-tier system in Arkansas is called extended juvenile jurisdiction. And in that particular case, in those cases, the prosecutor can move to take a younger age and put — and it's a blended sentence between the — and a youth is just found delinquent of a crime and not — and not found guilty. What are the factors the judges, prosecutors use in making that determination? Your Honor, at age 14 — and it's the specific — there are specific crimes that a prosecutor would move a case into an adult court. It is the prosecutor's discretion weighing their ten different factors that include the severity of the offense, the — and — but they also take into consideration the maturity of the youth, the — But if you submit that as a justification for your scheme, why couldn't those same factors be applied to the judge, by the sentencing judge, after the conviction? In other words, all of the — all of the discretion is up front before the conviction. Well, there is discretion up front, and that is the only — that is the only instance when a defendant can actually challenge a transfer, where a prosecutor decides to put it. But there are also — so there is — there's discretion at the — I guess my point is the concern is that we have two indefinite standards, too few specifics to guide the judge in determining whether there should be a life sentence. The same criticism could apply to the determination to set him — put him in the adult system at the outset. Well, Your Honor, the — it is — it is — admittedly, it is at the discretion of the prosecutor on — on those ages to move it into the — I assume discretion is guided by certain standards, or it's no discretion at all. So there are standards. Well, Your Honor, the — the prosecutor — that decision to move it in there is challengeable. It is reviewable by a court. He moves — the juvenile moves it to transfer it to — back to juvenile. That is appealed. Well, that was done in this case, and then the Arkansas — the Arkansas Court of Appeals reviewed that decision and said that — that the court — the court's decision was not erroneous. So that — that is the discretion that one would exercise on the front end. Again, on the — the latter end, this Court has said in Harmelin that the individualized sentencing is not required, and in fact, the — all of the — all of the — all of the mitigating circumstances that would — that have been considered because it's — he's — the death penalty has been taken off the table. That's a big — that's a big deal, especially in a case like this one, where Cuntrell Jackson, we believe the evidence showed that he also acted with reckless indifference to the value of human life, based — based on the evidence in this case, that he would be, by way of analogy, that he would be a Tyson offender himself. But irrespective of that, the legislature in Arkansas, it's — the legislative judgment has been that the minimum sentence that a person can receive for committing a capital murder in Arkansas is life without parole. I would like to clarify one point, I think, earlier that was made. The two other individuals in this particular case were — one was a cousin who testified against Mr. Jackson, and he was 15. He had turned 15 the day before this robbery. And the second — the second individual, the trigger man, was — he was also 14, and he received a sentence of life without parole as well. It's our position that — that, as is Alabama's, that the main — the principal justification in this case lies with the — the retributive principle, that society needs to convey the message that people like Laurie — that Laurie Troop's life, the victim in this case, was more important than the money in that cash register. The harm here was irrevocable. And this — this kind of — the punishment for this, it's qualitative — the death penalty is qualitatively different, but the punishment for — for this crime reinforces the sanctity of human life, and it expresses the State's moral outrage that something like this could happen. We think that the respect due life is — is what this message conveys, and it conveys it more as a life-without-parole sentence than it does life-without. Ginsburg You say the sanctity of human life, but you're dealing with a 14-year-old being sentenced to life in prison, so he will die in the prison without any hope. I mean, essentially you're making a 14-year-old a throwaway person. Chief Justice Alito Your Honor, I would — I'd respectfully disagree that he's a throwaway person. We want to — we want him to come to an understanding of his own humanity. We want him to realize the enormity of his crime. I can only speak for Arkansas, but in Arkansas, instances — it's not in the record, but this particular Petitioner, Jackson, has made efforts to obtain his GED. He's taken anger management classes. You can — juvenile life-without-parole sentence — people serving this sentence are enrolled in VOTEC programs in the prison. Sotomayor What hope does he have? Chief Justice Alito Excuse me? Sotomayor What hope does he have? Chief Justice Alito Your Honor, he has — the hope that he may have is that he is an application for commutation through the parole board. Other than that, he will — or perhaps retroactive legislation, if the legislature comes to another view. Sotomayor I'm sorry, I thought he was life-without-parole. I thought he was sentenced to life-without-parole. How can the parole board come to that? Chief Justice Alito Well, what I'm saying is the parole board is — reviews applications for commutation in Arkansas. So he — this particular Petitioner has not. Kennedy Commutations of life imprisonment sentence are ordered every year in Arkansas. Chief Justice Alito Your Honor, I don't have figures on that — on how many per year. But they — there is a case that — that listed — it's Rogers v. State. It is a 1979 case that actually listed 30 clemency requests were granted in the last five years from that opinion. They were life sentences and they were commutated. Kennedy Commutations from life sentences that were from life without parole? Chief Justice Alito Well, life without — life and life without parole in Arkansas are the same type of sentence. But do we know how old Lori Troop was when she was shot? Yes, Your Honor. Lori Troop was 28 years old when she was shot. She was discovered by her mother and her 11-year-old son. Breyer I understand the arguments, which are very good ones, for the importance of Arkansas emphasizing the importance of life and not killing people. But a person who is an adult, who is faced with the death penalty, which is certainly a strong statement along your line, is permitted by the Constitution nonetheless to make any inmitigating argument he wants. And Arkansas has to do that. They have to let him make any mitigating argument he wants. And so the argument here is basically, well, the same is true when a 14-year-old, because of the lack of maturity, faces life without parole. And that seems to be the hard issue in this case. Just as the death penalty is unique for anyone and therefore requires mitigating elements, isn't the life without parole special enough for an adolescent that you have to let him at least make any mitigating arguments he wants? Now, Arkansas hasn't really expressed a view in its legislation on that question, or maybe it has and just rejected it. But I don't know if that's – if you want to say something about that, I'd be interested. That's not a view that I know that's been expressed. Breyer. But I mean, that's what their brief is filled with on the other side, basically. And so is Roper. Yes, Your Honor. Especially. But death is qualitatively different, and that's been taken off the table. I think that all of those things that he would put to get the – that he would put to get the lesser sentence initially is that he would just get a, as I said, a lesser, lesser sentence. Did you say that Arkansas has no life with parole? Your Honor, the only provision – and this does go to show that Arkansas has thought about this in ways, has taken deliberate steps. In its extended juvenile jurisdiction, there is the provision that a, for instance, a 14-year-old in this particular case, if they had deemed that they would go in extended juvenile jurisdiction, could receive a life penalty except it is life with parole. Yes. So that is that. But that's not available to an adult. That's only in the extended. That's not available to an adult, no, Your Honor. As I – as I was saying, the – there's a certain constitutional symmetry to this case and to Graham's case because – because Graham committed a non-homicide offense and he was a youth, and so he had twice diminished punishment. But he only received one diminishment in his – in his punishment because he had – he was – he had twice diminished culpability. In this particular case, Jackson does not have twice diminished culpability. He has – he is a youth. Even if he were to – even if we were to say that, well, he didn't pull the trigger or we can't show that he didn't – that he acted – didn't act with reckless indifference, even if we were to say that that was twice diminished, he is still criminally responsible. There's not a – there's not a special class of not guilty by reason of youth. He is still criminally responsible for what he did. And teenagers must know that if you commit the worst crime, you will get the worst punishment that's available under the Constitution. And so the symmetry here is that Terrence Graham was the lucky one. It's not that Cuntrell Jackson was the unlucky one. This is a – when you go into a place with a sawed-off shotgun, it's a dangerous activity. It's inherently dangerous. And what was left out of the calculus a few minutes ago was the fact that he could for – it's not just kill or intend to kill, but foresee what could happen. And certainly, the evidence in this case demonstrated that Cuntrell Jackson could foresee that at an armed robbery, someone could get hurt. And that's what the law punishes, is the result. If there are no further questions. Roberts. Thank you, counsel. Mr. Stevenson, you have 8 minutes remaining. Just a few points. Justice Kennedy, I just want to kind of remark, there is some literature out there about commutation in Arkansas. And it was actually quite common up until 1980 in this case that my colleague referenced was prior to that date. But since then, it's been very uncommon. There's only been one commutation since 2007 with the current Governor, and that was for a non-homicide offense. I also want to say that just kind of consistent with my earlier arguments, that this Court did strike down mandatory death sentences in Woodson v. North Carolina  right here that made that sentence unconstitutional and inappropriate. And we think that in the same way, the Court could certainly do that here. But my final point is really to just say we are not suggesting that States should not be able to impose very harsh punishments and very severe sentences on even children who commit these kinds of violent crimes. That's not our position. The State of Arkansas and the State of Alabama have parole boards in place. They can even impose sentences that give them the authority to maintain control over the lives of these children for the rest of their natural lives. What we are arguing is that they cannot do so with no hope of release, that that would be incompatible with child status. And that's the rule of Roper. That's the logic of Roper and Grant. It can be argued that every person is more than the worst thing they've ever done. And a policymaker and a decisionmaker might consider that in constructing what kind of sentences to impose and what kind of regime to create, and that's totally up to the legislatures. But what this Court has said is that children are uniquely more than their worst act. They are quintessentially children in a way that the Constitution requires that we respect their child status. And our argument is simple. Our argument is that it would be unusual to recognize that in virtually every area of the law, but when a crime is committed, to simply abandon it, to simply ignore it. Roper and Grant teaches us that we can't do that consistently with our Eighth Amendment prohibitions. And so for that reason, it is unusual, and it's our judgment, that it would be cruel to declare these children fit only to die in prison, given what we now know about their status, about their development, and about their potential. And for those reasons, we would ask this Court to reverse the lower court judgments and grant relief in this case, Jackson v. Arkansas. Thank you, Mr. Stevenson. Mr. Holt. The case is submitted.